392 A.2d 305

COMMONWEALTH of Pennsylvania, Appellee,

v.

Melvin H. RITTER, Jr., Appellant.

Supreme Court of Pennsylvania.

Argued May 25, 1978.
Decided Oct. 5, 1978.

Allen H. Smith, York, for appellant.

John C. Uhler, Dist. Atty., Richard H. Horn, Asst. Dist. Atty., Floyd P. Jones, York, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION

MANDERINO, Justice.

Appellant, Melvin H. Ritter, Jr., was tried for the second time on January 26, 1976, before a judge and jury and found guilty of arson and two counts of voluntary manslaughter. (Appellant's first trial resulted in a conviction which was reversed by us, *Commonwealth v. Ritter*, 462 Pa. 202, 340 A.2d 433 (1975)). Post-verdict motions were denied, sentence of imprisonment was imposed, and this appeal followed.

The facts surrounding this appeal may be summarized as follows. On November 17, 1972, at approximately 6:00 a. m., a fire broke out in a four-story apartment building located

in the City of York, Pennsylvania. Two residents of the building died as a result of the fire. Investigation of the fire indicated that its origin was incendiary in nature and appellant, who was also a resident of the building at the time, was arrested and charged with starting it, and was ultimately convicted.

Initially, appellant argues that he should be discharged because the evidence presented by the prosecution at his second trial was insufficient to establish that the fire was of incendiary origin. The only reason given by appellant in support of this contention is that the opinion of one of the prosecution's expert witnesses (the Chief of the fire department of the City of York) was without foundation. Chief Robert Little testified as to his education and experience in the field of fire investigation. He stated that he had been employed as fire chief in the City of York since 1963, and that he had completed various courses in firefighting, first aid, and arson investigation during that time. Furthermore, he testified that he had been actively engaged in the investigation of the causes of fires within the City of York and had, over the years, investigated several hundred fires. He testified that he visually examined the scene of the fire in this case and, based upon his education and experience in fire investigations, determined that the fire originated inside a closet under the stairway leading from the first to the second floor of the four story apartment building. He stated that he could tell the fire began in that closet because of the pattern of the burn in the surrounding area as well as by the depth of the char in the wood in that area. He further testified that in his opinion the fire was of incendiary nature, having been started in some manner not accidental or spontaneous. He specifically stated that he excluded an electrical "short" as a possible cause of the fire. This conclusion was based on the fact that the fire quickly engulfed the stairwell and because the fire was not accompanied by large amounts of smoke. That testimony was properly introduced and, if believed by the jury, as it apparently was, was sufficient to prove that the fire was of incendiary origin.

■  Appellant also argues that the trial court ". . . should have suppressed all confessions, admissions and spontaneous declarations made by the appellant on or about November 21, 1972." We agree that the court erred in allowing certain witnesses to relate to the jury their allegation that appellant said in their presence: "I didn't mean to kill those people. I didn't want to hurt anyone."

The facts relevant to this issue are as follows. Appellant was arrested and taken to police headquarters, arriving there at approximately 12:30 a. m., November 21, 1972. From the time of his arrival until 3:00 a. m., at which time appellant stated that he set the fire, appellant was interrogated by an investigating state police officer. This officer testified at the suppression hearing held prior to appellant's original trial.

"Officer Soprano, testifying at appellant's suppression hearing, stated that after he initially spoke with appellant, he decided that appellant had a psychiatric problem and, in fact, tried to reach a psychiatrist prior to questioning appellant. In addition, the officer stated that during the course of the interrogation, appellant was whimpering, sobbing and 'really looked tired.' Moreover, the officer stated that appellant had not slept for three days prior to his interrogation . . . ." 462 Pa. at 203, 340 A.2d at 433.

Based on this officer's testimony, we concluded that the confession was not voluntarily given, and that its introduction into evidence at appellant's first trial was reversible error.

Following our remand, a new preliminary hearing was held at which two police officers employed by the City of York at the time of the investigation of this fire testified for the first time that appellant had, in their presence, made the admission referred to earlier in this opinion—that he did not mean to kill or hurt anyone. Appellant's counsel then filed a petition seeking, among other things, to suppress this alleged admission. It is the trial court's denial of this motion with which we are now concerned.

This alleged admission was testified to by these police officers at the preliminary hearing and at the suppression hearing preceding appellant's second trial, and at the second trial itself. It was purportedly made by appellant as he was being transported from the magistrate's office, after arraignment, back to the York County Prison. The time was between 1:30 and 2:00 p. m., November 21, 1972, (approximately 12 hours after the time of the statement made to interrogating state police officers and ordered suppressed by us). The evidence presented by the prosecution at the suppression hearing preceding appellant's second trial did not indicate that any of the conditions which compelled us to suppress appellant's earlier statement to the state police officer had changed in such a way that would indicate that this subsequent statement was voluntary. In fact, the prosecution's evidence indicates the contrary; that appellant still had not had any rest, that he was "shaky" and "crying," apparently still suffering from the same psychological pressures that prompted the investigating state police officer to seek psychiatric aid for him.

It is not relevant here that the statement ordered suppressed by us in appellant's first appeal was allegedly made in response to police questioning while the statement at issue in this appeal was supposedly "spontaneous." In ruling that appellant's earlier statement to the state police was involuntary, we stated that

"[T]he line of distinction [between a voluntary and an involuntary confession] is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *Id.,* 462 Pa. at 204, 340 A.2d at 434 quoting from *Commonwealth v. Alston,* 456 P. 128, 317 A.2d 241 (1974).

We continued, saying: "the testimony of the interrogating officer himself established that appellant was in no condition to knowingly and voluntarily confess to a crime . . ." *Id.,* 462 Pa. at 204, 340 A.2d at 434.

If appellant was in such a state of physical and mental exhaustion at 2:00 a. m. on November 21, 1972, he obviously

was in worse condition at 2:00 p. m. of that day unless he was afforded the kind of rest and care that would alleviate his condition. The evidence indicates, however, that during that time, appellant did not sleep, that he was examined by a prison physician who found him to be disturbed, depressed and crying, that he was taken from his jail cell to City Hall for processing (fingerprinting, booking), and was then transported by police car to the magistrate's office for arraignment. The statement allegedly made to the York police officers during the return trip from the magistrate's office to the county jail, like the earlier statements made at the police station, was not the product of appellant's free will. It also must be suppressed.

Judgment of sentence is reversed and a new trial granted.

POMEROY, NIX and LARSEN, JJ., filed dissenting opinions.

POMEROY, J., joins in NIX's, J., dissenting opinion.

POMEROY, Justice, dissenting.

I dissent. The findings of fact by the suppression hearing judge were as follows:

"With respect to the statements made by the defendant to Det. Thompson and Det. Bloss, we find as further facts that the defendant made some statements to the state policeman at or about 2 o'clock in the morning of November 21, 1972. These statements made to the state police were admitted into evidence at his trial and upon appeal to the Pennsylvania Supreme Court, the matter was reversed by the Supreme Court. . . .

"Now, sometime after the statement of the defendant to the state police, the state police then took the defendant to commit him to the York County Jail, and under the evidence, he reached the jail at 9 o'clock of that same morning of November 21, 1972. Thereafter, at about 1 o'clock that afternoon, the defendant was taken to City Hall at police headquarters there in the City of York where he was processed for arraignment. Prior to that

time, he had been read the warrant for homicide and for arson by one of the policemen and after he was processed at City Hall, he was taken to the Magistrate and there arraigned at about 2 o'clock in the afternoon. Then he was driven in a police car from the Magistrate's office to the prison.

"On the way in the police car to the prison in the company of Det. Bloss and Det. Thompson, and as the defendant passed the scene of the fire or at or about that time, the defendant voluntarily and without having been asked any questions by either of the policemen, made the statement 'I didn't mean to kill those people. I didn't mean to hurt anyone.' Moreover, at the time he was being processed at City Hall which was sometime between 1 o'clock in the afternoon and 1:30 o'clock in the afternoon of November 21, 1973, while the defendant was talking to Det. Bloss and at or about the time a radio broadcast was made concerning the defendant being charged with the various crimes in question. Again the defendant voluntarily and without being interrogated concerning the crimes made the statement in the presence of Det. Bloss, 'I didn't kill anyone.'

"I have incorporated into evidence in this suppression hearing all of the testimony concerning the defendant's mental emotional condition prior to the time that he made the statements to the state police. The defendant himself testified here today that he does not remember anything concerning the events in question. The defendant's father testified that he saw the defendant either the morning of the 21st or the morning of the 22nd, but he does not remember which day, and the substance of the defendant's father's testimony was that the defendant couldn't remember anything and not accountable for what he said.

"On the other hand, both Det. Bloss and Det. Thompson testified that when the defendant was in their presence, either at City Hall or in the car, the defendant appeared normal; that while it is true he did start to cry at or about the time he made the statements in the car, he appeared to be rational and was able to know what was going on.

Gerald Sweeney, who was then a detective of the York City Police Department, also testified when he saw the defendant at City Hall the defendant knew what he was doing.

"Preliminarily, we might say we find it difficult to understand why the defense would want to suppress the statement made at City Hall since that is exculpatory. The defendant there said, 'I didn't do anything or kill anyone.'

"MR. SMITH [appellant's counsel]: We are not suggesting that be suppressed.

"THE COURT: So we now add to this, defense counsel has indicated to the Court in open court that the statement does not want to be suppressed and we won't take any action on that. We think, under all of the circumstances, that whether or not the defendant's emotional condition was the same or better or worse at 2 o'clock in the afternoon when he made the statements to the police then [sic] at the time he talked to the state police at 2 o'clock in the morning is really a question for the jury. We are not convinced as a matter of law or under the evidence that the defendant at the time he made the statements to the two detectives in the car that he was in such a mental or emotional state that he is not accountable for what he said. We, therefore, conclude as a matter of law and find as a fact for the purposes of this suppression hearing that when the defendant made the statement to the police in the police car going to the prison that afternoon that he was able to know what he was doing; that the statements were made voluntarily, without any coercion and not while he was being interrogated by the police and in view of the voluntary nature of the statements to the police and in view of the fact we believe that his physical and mental condition was sufficient to permit him to make the statement. . . ."

The suppression court, based upon the above findings, overruled the appellant's motion to suppress the oral statements made to the detectives on the afternoon of November 21, 1972.

We have repeatedly said that when a suppression court's findings of fact are supported by the record, they may not be disturbed by an appellate court. *E. g., Commonwealth v. O'Bryant*, 479 Pa. 534, 388 A.2d 1059, 1061 (1978); *Commonwealth v. Hall*, 475 Pa. 482, 486, 380 A.2d 1238 (1977); *Commonwealth v. Gray*, 473 Pa. 424, 431, 374 A.2d 1285 (1977); *Commonwealth v. Lewis*, 472 Pa. 235, 239, 372 A.2d 399 (1977); *Commonwealth v. Sparrow*, 471 Pa. 490, 497–98, 370 A.2d 712 (1977); *Commonwealth v. Bundy*, 458 Pa. 240, 328 A.2d 517 (1974). This principle should apply with full force to the case at bar.

NIX, Justice, dissenting.

The mere fact that a suspect is in a weakened condition which would justify a finding that he could not effectuate a waiver during police interrogation does not necessarily require the exclusion of spontaneous, volunteered statements which are made in the absence of police interrogation or coercion.

LARSEN, Justice, dissenting.

I dissent. The majority totally ignores the testimony of a physician and two police detectives to the effect that the defendant, when he made the spontaneous incriminating statement, knew what he was saying and doing. The Honorable James E. Buckingham was correct in admitting the statement into evidence.